WILDS, Administratrix, &c., *v.* THE HUDSON RIVER RAILROAD COMPANY.

A party claiming to have been injured by the negligence of another must fail in his action, unless it appear that he was free from any negligence without which the injury would not have happened. The greatest negligence on the part of the defendant will not cure the defect of the least negligence contributing to the injury on the plaintiff's part.

Cases of negligence form no exception to the rule that it is the judge's duty to nonsuit where a verdict for the plaintiff would be clearly against the weight of evidence.

Wilds *v.* The Hudson River Railroad Company.

One driving in a highway across a railroad is guilty of negligence fatal to an action, if he does so without looking for a train which he would have seen, or listening for signals of its approach which he would have heard, in time to have avoided a collision.

It is also such negligence in one knowing the position of the railroad and the frequent passage of trains, to approach the crossing at such speed as to be unable to stop his horses before actually getting upon the track. It is error to refuse so to charge without the qualification that the defendant must have used proper precautions to notify travelers of the approach of a train.

ACTION under the statute for causing the death of the plaintiff's intestate by the negligence of the defendant in running a train of cars in the city of Troy. It appeared, upon the trial at the Rensselaer Circuit, that Wilds, the deceased, was a farmer residing about twelve miles from Troy. He received the injury from which he died while crossing the defendant's road, which has two tracks, at its intersection with Fourth street. Both parties gave evidence tending to show negligence in the other. The evidence and the questions arising upon the trial are sufficiently stated in the following opinion. The plaintiff had a verdict and judgment, and the defendant appealed to this court.

*John H. Reynolds,* for the appellant.

*William A. Beach,* for the respondent.

GOULD, J. This case comes before us on two appeals. One from an order of the general term of the Supreme Court, affirming an order of the special term which denied the defendant's motion for a new trial, made on the minutes of the judge who tried the cause; that appeal bringing the case up as if on a case made. The other appeal is from the judgment of the Supreme Court, affirming the judgment rendered at the Circuit on a verdict; this appeal bringing before us the exceptions taken by the defendant to different parts of the charge to the jury, and also the exceptions taken to the denial of the defendant's two motions for a nonsuit; one made at the close of the plaintiff's testimony; the other made at the close of all the testimony.

The right to recover damages for this class of injuries to the person (whether asserted by the party injured, or by his representatives under the statute), depends upon two concurring facts: 1st. The party claimed to have done the injury must be chargeable with some degree of negligence, if a natural person; if a corporation, with some degree of negligence on the part of its agents or servants; 2dly. The party injured must have been entirely free from any degree of negligence which contributed to the injury; *i. e.*, of any negligence without which the injury would not have happened.

These essential elements of such a cause of action are as absolutely distinct from, and independent of, each other, as are the two opposing parties; and each and both must be, by itself, in the case, upon the evidence, or there can be no recovery. The question presented to the court, or the jury, is never one of comparative negligence, as between the parties; nor does very great negligence, on the part of a defendant, so operate to strike a balance of negligence as to give a judgment to a plaintiff whose own negligence contributed in any degree to the injury.

It is true, that some of the reported cases of this kind of action use, in a very uncertain manner, the terms "gross negligence," "ordinary negligence," "ordinary" or "common prudence," and similar terms. But however applicable such terms may be to the cases of bailment of property, and between the different well-known classes of such bailors and bailees, it is difficult to see how they have strictly and legally any application to cases like the one under consideration. No element of fraud (or *quasi* fraud), or willfulness, enters into the cause of action. (*Wells* v. *N. Y. C. R. R. Co.*, decided last term.) The law says to the defendant, if you have by simple negligence caused this injury, so far as you are concerned the ground of action is complete. At the same time it says to the plaintiff, although, so far as the defendant's acts are concerned, the case is made out, you cannot prevail, if you have, by your simple negligence, helped to bring about the injury.

Wilds *v.* The Hudson River Railroad Company.

Another preliminary point (to be passed upon generally, before we can decide as to its being applicable to this case), is the claim that the question of negligence belongs peculiarly to the jury; and that cases involving that question should never be taken from them to be decided by the court. To this position it should be answered, that there is no case known to the law (even the question of fraud, in certain cases where the statute says it is to be submitted to the jury), in which an appellate court has not and does not on proper occasions exercise the power of setting aside the verdict of a jury, not merely when it is entirely against evidence, but when it is clearly against the weight of evidence. And no court can be guilty of the absurdity of holding that, in such a case, it would not have been competent for the judge, who tried the cause, either to nonsuit the plaintiff or direct a verdict in his favor, as the case might have required. No legal principle compels him to allow a jury to render a merely idle verdict.

The full extent of this position has been held by this court (*Johnson* v. *Hudson River R. R. Co.*, 20 N. Y., 73), in saying that, " *to carry a case to the jury*, the evidence on the part of the plaintiff must be such as, if believed, would authorize them to find that the injury was occasioned *solely* by the negligence of the defendant." Can this be true without holding that, in every case where a verdict would be set aside as against the clear weight of evidence, the court should take the decision of the case from the jury? Certainly, it is not easy to conceive any other definite position which would be consistent with the decisions. (18 N. Y., 422.)

Nor is the applicability of the rule varied by saying that the evidence may consist of circumstances, from which inferences are to be drawn as to negligence; and that, as different minds may draw different inferences from the same circumstances, the jury must always be the judges of negligence where the evidence is circumstantial. No one ever supposed that the right of a tribunal of review to reverse a verdict as against the weight of evidence was confined to cases of direct, positive testimony. The right covers all cases, by whatever

kind of legal evidence any of them are sought to be proved; and it proceeds according to the weight of the evidence, whether circumstantial or not. If the circumstances are such that from them can be drawn two opposing inferences, either one equally consistent with the proof, it is no argument against the rule; but the case is one where there is not a clear preponderance of evidence either way, and the rule is simply inapplicable. Still, in precisely such a case (*Cotton* v. *Wood,* 98 Eng. Com. Law, 566), it has been explicitly held that the court should nonsuit, because negligence on the part of a defendant (as care on the part of a plaintiff, in another case, cited *post,*) must be made to appear by the evidence. This case says, "the judge will not be justified in *leaving the case to the jury,* where the plaintiff's evidence is *equally consistent* with the absence, as with the existence, of negligence in the defendant." But there are many cases in which care, or the want of it, is unmistakably apparent on the face of the circumstances. To walk within six inches of the curbstone of a sidewalk is not careless; but to walk as near the edge of a precipice is the act of a madman. Upon both points — the rule as to negligence on the part of the person injured, and that as to the duty (as well as the right) of a court to pass upon the question, and nonsuit — there are three strong cases: One in 91 Eng. Com. Law, one in 29 Conn., and one in 1 Allen (Mass.), 187. The Connecticut case (pp. 208, 209,) says that the rule, that the party injured must have acted with ordinary prudence, is a stern, unbending rule, which has been settled by a long series of adjudged cases, and must be considered as settled law. And the decision set aside a verdict, as against the evidence as applied to this rule; and that was a case where it was conceded that the defendant was negligent. The case in 91 Eng. Com. Law (pp. 148, 149,) affirmed a nonsuit because (though there was some evidence that defendant's servant was negligent) there was not evidence enough to take the case to the jury. While the case in 1 Allen (pp. 187–190) lays down, as the undoubted law (of Massachusetts), that the plaintiff must show "by *affirmative* proof

that *he was in the exercise of due care;*" and for failure of such proof, the court should, as it did, nonsuit.

Let us examine this case upon the principles of all but the last case (not passing upon that). What proof is there of want of care on the part of the defendant? So far as the plaintiff's witnesses are concerned, one man, a tin peddler, who stood by his tin wagon, some five rods from the track, talking to a woman to whom he was trying to sell his tin ware, says he first heard the whistle a very short time before Wilds was struck by the engine, or almost at that instant; and that he heard the bell of the engine before the engine was in sight; that Wilds drove on to the track as the train was coming, and was nearly across it when he was hit; that the train was coming fast for that part of the track, where it does not generally go fast. He is the plaintiff's only witness who saw the occurrence; and he says he did not see a flagman there. The point of collision was at the crossing of the railroad track and Fourth street, in the lower part of the city of Troy; and the time, noonday. Carroll (a passenger on the train), called for the plaintiff, says he can't tell how fast the cars were then moving; they were running very rapidly, he thinks. Eddy testifies as to the measurement of distances only; chiefly as to how far up the track a person could see from Fourth street, below the track; and says, a man sitting in a wagon 25 feet south of the south track, in the centre of Fourth street, could see the cars at a distance of 650 feet. Gifford testifies that, from the point of collision to the point where the train was stopped after the collision, was about 400 feet. This is all the plaintiff's evidence on the subject. No proof was offered to show any rate of speed; or whether "fast for that part of the track," or (what the witness thought) "very rapidly," was six miles an hour, or any other rate; and no evidence was offered to show within what distance a train could be stopped when going at any specified rate of speed. This evidence proves these facts: that the defendant complied with the statute, by giving the warning of the bell, so that it was heard by the plaintiff's only witness at a distance sufficient, and in time

sufficient, to give abundant notice to all persons to keep off the track; that at the time of such warning, and as the train was approaching the crossing, Wilds was not (nor was any one), upon the track, for the engineer to see him and check his train; and that the engine ran against an object which was put upon the track suddenly (on a trot), and when the engineer had no reason to anticipate or try to avoid hitting it. It would seem difficult to say that here was any proof of any negligence of the defendant. And negligence, like any other ground of action, is to be proved.

Add to this the defendant's evidence. Orr testifies that he heard the whistle before the flagman went to his position; and of course, from the whole evidence, this was the long warning whistle (as a signal of an approaching train), not the short sharp whistle for stopping, which was but the instant before collision. Maria Banker heard the whistle and bell before Wilds came up to the track. These two witnesses had no connection with the railroad company. Agan, the flagman, heard both whistle and bell before he went from his flag-house to the flagman's station upon the crossing. Young, the conductor, testifies to the sounding of the long warning whistle as far off as the bridge above the hospital. Gregory, the engineer, says the whistle was sounded above the hospital, and the bell was ringing all the time from the depot to the crossing in question (half a mile). Porter, the fireman, says he rang the bell all the way down, and the whistle was sounded above the hospital. Van Hoesen, the brakeman, says the whistle was sounded and the bell rung through the cut (which terminates at the hospital). Roarke, baggage-master, says the long whistle was blown long before they got to the place of collision. Thus eight witnesses, not in any way discredited (by cross-examination or otherwise), two of whom had no bias for the defendant, establish affirmatively that the company did give the proper warning of approach; and as to that point, it is beyond controversy that there was no negligence on the part of the defendant.

As to speed: Young thinks it about five miles an hour; Gregory says it was about five or six miles an hour; Porter says

about six miles an hour, as estimated to the best of his know-ledge; Roarke says about six or seven miles an hour. It is proved that the rails were slippery from a recent rain, which rendered stopping quickly difficult. But there is no proof as to the distance required for stopping a train, at any rate of speed. And even if the rate of speed might have something to do with the question of defendant's want of care, there is no shadow of proof that it did.

The only other point on which the plaintiff's case made even a suggestion of negligence on the part of the defendant is, that the one witness, Gillespie (the tin peddler), says, " there was no flagman there that he could see." On this point, he is un-questionably in error. Porter, Orr, Maria Banker, O'Brien, Agan (the flagman), Ware, six witnesses, four of whom were unconnected with the company, testify not merely to the flag-man's being there, but to his making abundant signals of an approaching train, and being nearly run over, actually hit, by the team of Wilds. Due care in this respect is abundantly, overwhelmingly proved. Nor is it at all material to this point of due care whether the flagman, being on the track and waving his flag as a signal, was devoting his particular atten-tion to keeping back Wilds, or to keeping a woman and child out of danger. He was there, making signals plainly visible to all; and that he could not attend to two, at once, when both were bent on running into danger, was not his fault, or that of the company. The men upon the engine tried to stop, as soon as they saw any reason for stopping. Seeing the flagman in his place, to keep persons off the track, and there being no one on the track, they had no reason to suppose that any one would disregard all the usual warnings, and get on the track, directly under the engine. As soon as Wilds did this, they saw him, and attempted all possible means to avoid the col-lision; but it was then inevitable.

The entire evidence fails utterly to show any degree of neg-ligence on the part of the company; and the second motion for a nonsuit should have been granted.

On the other hand how stands the proof of carelessness on the part of the deceased? The plaintiff's chief witness, the only one who saw the occurrence, says, "when I first heard the whistle he was getting right on to the south railroad track with his horses. If he had stopped then, he would not have been hit: he could not stop very easily." He did whip his horses, and went across this south track, and nearly across the north track, when on that track his wagon was struck.

The defendant's witnesses show a very strong case of carelessness, if not one of utter recklessness, on Wilds' part. Orr testifies to the flagman's being in the middle of the street, between the two tracks, waving his flag both ways, and that teams were checked by that and waited; that O'Brien attempted to stop Wilds by throwing up his hands and shouting at him; and that, failing to stop him by these means, O'Brien stepped into the street and tried to catch the horses. Wilds drew up the reins, whipped up the horses, and went across the track, when the engine struck him. That Wilds' horses in crossing struck the flagman and turned him around two or three paces. That when O'Brien shouted to him, the horses were fifteen feet from the south track, and coming upon a smart trot. Maria Banker says that, having heard the whistle and bell, she looked out of her window (which commanded a clear view of the spot), and saw this man approaching on a fast trot. She hallooed to him to stop; he looked around; she hallooed to him again; he whipped his horses; the flagman held his flag before the horses; the flagman was hit by the horses and went down. When she hallooed, the horses had not got on to the south track. O'Brien says the flagman was in his position swinging his flag, and that, seeing Wilds coming upon a trot, and knowing him, he started towards him to keep him back, holding up his hands to him for that purpose; and finally he tried to grasp the horses. The horses passed him, went on the track, hit the flagman in the back, went on in front of the engine, and the collision occurred. Agan, the flagman, says he was in his proper place, waving his flag; that his immediate attention was taken by a woman with a child in her

arms, whom he was keeping off the track, when Wilds' team struck him, as he was standing on the south track, and he barely escaped with his life. Ware was further off; he saw the flagman there, and says he was trying to keep Wilds back, and that Wilds kept pushing up and hit the flagman. He says the flagman was facing Wilds; an error not very remarkable in the confusion, and not important, since he confirms the facts that the flagman was there, and was struck by the team. It is further in evidence that the railroad had been in operation there for some eighteen months; and that Wilds was well acquainted with the city ; came to it every Saturday to supply his customers with the produce of his farm (which was some twelve miles out), and that on this day he had gone to South Troy, across this very track, to a customer's house : so that he knew the railroad was there, and all about the crossing. Is it possible, from all this body of direct evidence, to draw two inferences? Can there be a doubt that Wilds knew the train was coming, and preferred to take his chance of speed insuring his safety? Or if there can be any doubt of this, is it not inevitably certain that all the appliances of caution proved to have been used must have made him aware that there was something unusual at that point, calling on him for at least sufficient attention to look about him, and find out what it was; so far, at any rate, as not to run over a man, who, for some purpose and with a signal flag, was standing in the street and directly in his way? If his horses were at all troublesome to manage (though there is no proof that they were, until they were actually on the south track and near to the engine, before which he had notice enough to pause), there were men enough on the spot, ready and able to assist him in holding them, and one man tried to hold them back, not being called on. If Wilds was careful, it would be difficult to imagine a case of want of care.

The case is much stronger than that of *Steves* v. *The Oswego and Syracuse Railroad Company* (18 N. Y., 422–427), in which this court sustained a nonsuit; and that case remains the law of the State.

It is quite usual, in similar suits, to find counsel, and some-times judges, disposed to dwell upon the alarming power of a locomotive, and the appalling danger of running one anywhere but in a wilderness; and great stress is laid on the strict and untiring watchfulness and care that are required of those who use so dangerous a thing. All this is very true. But there are two sides to these facts. If a locomotive be eminently dangerous, everybody knows it to be so. And it is as danger-ous to run against, or under it, as to have it run over you. A railroad crossing is known to be a dangerous place, and the man who, knowing it to be a railroad crossing, approaches it, is careless unless he approaches it as if it were dangerous. To him, the danger is vastly greater than it is to the locomotive: he may lose his life. And if the Company be bound to use very great care not to endanger him, why is not he bound to use equally great care not to be endangered? His care should be as much graduated by the danger as the Company's. When every one, who knows that the railroad is there, is bound to know and to remember that a train may be approaching, not to take the very simple precaution of looking and listen-ing, to find out whether one is coming, cannot but be want of care. To be sure, the statute requires a railroad company to give specified warnings; but it neither takes away a man's senses, nor excuses him from using them. (18 N. Y., 425, 426.) The danger may be there: the precaution is simple. To stop, to pause, is certainly safe. His time to do so is before he puts himself in "the very road of casualty." And if he fails to do so, it is of no consequence, in the eye of the law, whether he merely misjudges or is obstinately reckless. His act is not careful; and he is to abide the consequences, not the Company under or into whose train he saw fit to run, whether he did so in inexcusable ignorance or in the belief that he could run the gauntlet unharmed. Nor is the court to look about to find how he, after putting himself there, conducted; whether he then took the best means of escape, or in his confusion ran more hopelessly into the jaws of death. No degree of presence of mind, and no want of presence of mind, at that time, has

anything to do with the case. He should not be there, by want of care.

Much weight is given to the fact that the place of such collisions is a highway, and that the traveler has a right to be there with his vehicle. Certainly it is a highway, or he would have no right to be there at all, and he could not recover, no matter what might be the negligence of the Company. Further, it is a part of a railroad track, and the train has a right to pass there. It is a place in which two easements have a common right; and it is the right of the public that both shall be so enjoyed as not unnecessarily to interfere with or abridge the rights of either.

A sound and reasonable view of cases of this description is of as much importance to the public as it is to railroad companies. Such corporations are to be treated precisely as any other party to a suit. No more stringent rule is to be applied to them than is applied to individuals; nor is any less stringent one. Every citizen of the State has a deep interest in the existence and the successful operations of such companies. The facilities of travel which they afford, the means they give of accumulating and of diffusing the products of our wide land and of our vast commerce, have already produced the mightiest results in the development and the unparalleled increase of the resources of the nation. They have clothed us with the richest garments of peace; and they have multiplied our armies and wielded our weapons of war. To do this, they have needed those powerful means the use of which is necessarily accompanied with danger. But, as the public has the benefit of those means, it is bound to incur its own share of that danger. A mutual duty is enjoined, and a mutual liability results from a failure to perform that duty; and a party who fails in performing his own part thereof, is in no condition to enforce the penalty of a breach on the other party.

Having considered the points embraced in the appeal from the order denying a new trial on the merits, we come to the exceptions contained in the appeal from the judgment.

The first exception to the charge of the judge is thus taken : Defendant requested the court to charge " that, if the negligence of the deceased in any manner contributed to cause the collision which resulted in his death, the plaintiff cannot recover." The request was so far complied with as to give the charge in the terms asked, qualifying it with the words, " it being understood that this negligence is the want of such care as a person of ordinary prudence would exercise in like circumstances." The defendant asked for his single, definite, legal proposition; and excepted to having it accompanied by any addition to give it uncertainty, or tending to confuse the minds of the jury. And, if his request contained a legal proposition, which, unqualified, was sound and applicable to the case, he had a right to have it announced to the jury, if not in the very terms asked, at least substantially so, and not so qualified as to alter the principle or to add to it in any way to render it uncertain or tending to confuse the jury ; or, he should have it refused, either directly, or on the ground that the charge already given has properly covered the law of the case. And while a juryman might suppose that he knew what, in the circumstances proved, constituted " negligence," he might be puzzled with so utterly indefinite a qualification, especially as, in a prior part of the charge, the jury had been told to consider, in estimating what would be negligent in Wilds' approach to the crossing, " whether he understood the signals;" thus putting on the Company the obligation, not merely of making the signals, but of furnishing understanding to the other party.

The defendant's request certainly gave, in precise words, the true legal rule of the case; and he was entitled to have it given to the jury substantially as he asked it without qualification, or to have it plainly refused. The defendant's next request to charge was, " that if the deceased approached the crossing, knowing the position of the railroad, and that trains were frequently run thereon, at such a rate of speed that he was unable to stop his horses before actually getting upon the track, and that speed contributed to cause the collision, the

plaintiff cannot recover." This, inasmuch as the charge had already, as against the defendant, included the element of speed as constituting negligence, and had said "the speed should be regulated with reference to the apparent danger;" this would seem an entirely proper request, that each party might be held to looking out for the apparent danger. It was refused, except with the qualification that the defendant must have "used all proper precautions to notify travelers of the approach of the trains" (with other qualifications as to "ordinary prudence"). Which is equivalent to saying that the want of care of Wilds depended upon the exercise of care by the Company; and that he might approach a dangerous place with utter recklessness unless the Company used all care; while the Company must approach the same place with "all proper precautions," or be liable, not merely for its own want of care, but for that of all comers. This is too unequal to be sound. Each one's care, or want of care, exists in his own act, without the slightest reference to care, or the want of it, in the other party. Each is governed by his own independent volition, with which the other can by no possibility have any connection; and on the exercise of that volition by each, and on that only, depends the act which is either careful or not.

A further request to charge on the part of the defendant contained the proposition "that if the deceased was aware of the approach of the train, in time to have stopped before reaching the track upon which the train was approaching, and intentionally drove upon the track, after being aware of the train, the plaintiff cannot recover." The court refused to charge in this form. The request covers this ground, that, if the deceased, knowing that a train was approaching in season to take his own course, and decide whether to be safe, and stop, or to go on and run his chance, chose to go on, he must abide the risk that he took. It is rather difficult to see why this is not the law. Certainly no legal rule is consistent with qualifying the position by leaving it with the jury to speculate on the idea whether he "would have stopped in the exercise of reasonable care, &c., and could not reasonably expect to

pass in safety, and intentionally drove upon the track," &c.: This limits the negligence on his part to a grade little short. of suicide.

Another of the defendant's requests to charge claimed that "the deceased cannot, by his own negligence, cast upon the defendant the necessity of exercising extraordinary care." The court added after the word "negligence," "*as above defined and contributing to the injury.*" The request seems to state an accurately correct legal proposition; and the defendant was entitled to have it given to the jury as hereinbefore stated.

The judgment of the Supreme Court and its order should be reversed; and a new trial granted, costs to abide the event.

· DAVIES and SMITH, Js., concurred; DENIO and ALLEN, Js., were also for reversal, the latter on the ground of the plaintiff's negligence. All of them agreed in respect to the right and duty of a judge to nonsuit in cases of this character.

SUTHERLAND, J., (dissenting). The question is, whether the whole case at the close of the testimony was not a case for the jury; whether the question of negligence on the part of the intestate, as well as the question of negligence on the part of the employees of the defendant, were not both questions for the jury, to be passed upon by them as questions of conduct or misconduct, under all the circumstances of the case.

In my opinion, the acutest human intellect will glance off with every attempt to make either of these questions, questions of law.

It may be conceded, that there was no contradictory evidence as to the conduct of the intestate, in approaching the crossing; yet, whether such conduct was negligent or not, was a question for the jury, under all the circumstances of the case. · The circumstances of a particular case may be conceded, and yet, as evidence or arguments on the question of negligence, they may be, and generally are, conflicting; that is, some of the conceded circumstances may, and generally do, tend to show negligence, and some, care and attention. Negligence is a conclusion or judgment as to conduct, arrived at

by weighing or comparing these circumstances or arguments. I have always understood that the common law had made it the province of the jury, when the trial was by jury, to pass upon these circumstances and draw the conclusion.

Sir William Jones, at the conclusion of his work on Bailments, states this as a corollary from the principles therein laid down. At an early day, the books and judges undertook to define, as between bailor and bailee, gross, ordinary and slight negligence. It must be conceded, if gross, ordinary and slight negligence, as between bailor and bailee, had been defined by the law, so as to be practicable, then, whether the conceded circumstances of a particular case constituted or showed gross, ordinary or slight negligence, would be a question of law; but even as between bailor and bailee, on a conceded state of facts, the question of gross negligence has been held to be a question for the jury. (*Dorrman* v. *Jenkins*, 2 Adol. & Ellis, 256; *Nelson* v. *Macintosh*, 1 Starkie, 237.) In *Patterson* v. *Wallace*, in the House of Lords, 1853 (28 Eng. Law and Eq., 48; *S. C.*, 1 McQueen, 748), there was no controversy about the facts, but only whether a certain result was to be attributed to negligence on one side or to rashness on the other. The judge having withdrawn the case from the jury in the court below, it was held in the House of Lords to be a pure question of fact for the jury; and the judgment below was reversed. At the conclusion of his opinion, Lord Chancellor CRANWORTH says: "With all deference to the learned judges, it appears to me that they have misunderstood the province of a judge at a trial of this sort." See, also, *Fraser* v. *Hill* (1 McQueen, 397), to show that it is the province of a jury to draw the presumption of a fact from circumstances; also, Chancellor JONES' opinion, in *Jackson* v. *Seward* (8 Cow., 409, &c.; 1 Greenl. Ev., §§ 44, 48.)

In *Bernhardt* v. *Rens. & Sar. R. R. Co.* (32 Barb., 169), the question arose on a motion to nonsuit. Judge INGRAHAM, in his opinion, says: "It will not be denied that negligence is, in all instances, a question of fact." This case was affirmed in this court, but has not been reported. Judge SELDEN says,

Wilds *v.* The Hudson River Railroad Company.

in his opinion in the case in this court: "It is not easy to suppose a case in which the court would be warranted in holding, as matter of law, that negligence was proved."

A question of negligence presents the question, what a person ought or ought not to have done under the circumstances of the case. The law has not undertaken, except in certain instances, to define, and could not very well define, this duty under particular circumstances; for it could not anticipate and define the circumstances under which the duty arises. A question of negligence is a question belonging to the common affairs and experience of men; it is a question to be decided under the circumstances of the case, by the common experience of men as to the duties of each other. Its decision is really the expression of an opinion or judgment as to the conduct of another under particular circumstances; and, as has been observed, it is very rarely, even where there is no controversy about the circumstances, that they are not conflicting, as evidence or arguments on the question of negligence; for some will tend to show care, and some negligence.

This being the nature of a question of negligence, is it extraordinary that the common law should have committed the decision of it to a jury?

If, as was intimated by Judge BARCULO, in *Haring* v. *New York & Erie R. R. Co.* (13 Barb., 9), juries cannot be safely trusted with this question, as between an individual and a railroad corporation, then, in such cases, let the legislature alter the common law, and, in such cases, commit it to the court.

It is very clear to me that, in this case, the questions as to negligence on the part of the intestate, as well as to negligence on the part of the defendant's employees, were questions of fact for the jury; and that the court very properly refused to hold otherwise.

My conclusion is, that the judgment of the Supreme Court should be affirmed, with costs.

SELDEN, Ch. J., and WRIGHT, J., were absent.

Judgment reversed and new trial ordered.