## APRIL TERM, 1896.

### THE DENVER TRAMWAY COMPANY V. REID.

1. EVIDENCE.

Under the circumstances stated in the opinion, the error committed in admitting evidence tending to show that a witness had been suspected of having been implicated in a burglary, the only purpose of which was to prejudice the jury against him, is not cured by permitting such witness to be recalled to deny all connection with the crime.

2. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

When, as by cables or electricity, transit on street car lines is accelerated, the danger incident to travel thereon is increased, greater care is exacted both on part of the passenger and the carrier.

3. SAME—QUESTION OF FACT.

In an action for injuries received by a passenger in alighting from a slowly moving train of electric cars, the question of the plaintiff's negligence is one of fact for the jury.

4. SAME—DEGREES OF NEGLIGENCE.

Comparative degrees of negligence, as slight and gross, are not recognized in this jurisdiction.

5. CONTRIBUTORY NEGLIGENCE.

The plaintiff cannot prevail, in an action for injuries received while alighting from a moving street car, if his own negligence contributed to the injury, and without which it would not have happened.

*Appeal from the Court of Appeals.*

ACTION for personal injuries.

In the trial court the plaintiff recovered judgment for fifty-five hundred dollars ($5,500). This judgment was affirmed by the court of appeals, and from this latter judgment this appeal is prosecuted.

Plaintiff, at the time of receiving the injury, was a passenger for hire upon a street car that was being operated by the defendant company in the city of Denver. The particular manner in which the accident occurred, and the nature and extent of appellee's injuries are alleged in the complaint as follows:

" * * * While the plaintiff was in the act of getting off and alighting from the cars of the defendant, and without any fault or negligence whatever on the part of the plaintiff, the said train of the defendant was so negligently and carelessly operated and handled by the said defendant, and the said electricity by which said train was operated was so carelessly, negligently and unskillfully used, that an unexpected and sudden jerk or motion was communicated to the said train, whereby the plaintiff was violently and with great force thrown down upon the track upon which said cars were running and between the cars of said train, and through the negligent conduct of the said defendant, and by reason of the negligent, careless and unskillful manner in which said train and said electricity was used and operated, the plaintiff received on, upon and into his body large quantities of said electricity, and that, by means of said electricity, his whole system was greatly burned, shocked and injured, so that by means of the fall occasioned by the sudden motion of said train as aforesaid, and by means of the powerful shock received from the electricity aforesaid, and the burns aforesaid, the plaintiff was greatly and severely hurt, bruised and injured in and throughout his limbs, his body and his whole system, and that his limbs and body have been and still are, to a considerable extent, paralyzed and rendered unfit for their ordinary functions and uses, and that he was otherwise *severely hurt, bruised and injured* generally throughout his whole body and limbs by *being so thrown down as aforesaid*, and by means of said electricity aforesaid, and that said hurts, burns, bruises and injuries aforesaid, so caused by the negligence of the defendant as aforesaid, are of a permanent and lifelong character, and have to the present time, and, at all times hereafter, will prevent the plaintiff from doing or performing manual labor; that he has suffered great pain and anguish on account of the hurts and injuries so received as aforesaid, and still suffers."

"And so the plaintiff alleges that he has been damaged, by reason of the premises, in the sum of $20,000."

Plaintiff, in his direct examination, described the accident as follows :

" I sat down until the car stopped, and I just got up as it was stopping, and I put my hand to the rail and was going to get off when it made a sudden and throwed me off.

" Q. Made a sudden what?    A. Made a sudden stop.

" Q. And you were thrown off?    A. I was thrown.    It twisted me around betwixt the two cars."

And on cross-examination :

" Q. Did you look to see whether it had stopped before you stepped down ?    A. Of course, the car hadn't stopped.

" Q. You were stepping down on to the step?    A. Yes, sir.

" Q. What were you doing with your hand ?    A. Doing nothing, except to catch the rail.

" Q. Were you facing the side of the street when you stepped off ?    A. Yes, sir, facing the front, the next car ahead of me.

" Q. Which hand did you take hold of the rail with?  A. The right hand.

" Q. Which hand is it you claim is injured ?    A. This is the worst [raising his left hand].

" Q. You took hold with the right hand and started to step from the step on to the ground, did you ?    A. Yes.

" Q. And then you were thrown off and fell?    A. Yes.

" Q. That is all you know about it?    A. Yes.

" Q. Did you ever ride on these cars before after dark ? A. Yes, I rode on them before after dark.

" Q. How many times?    A. Oh, I don't know ; maybe two or three times.

" Q. Do you know how fast the car was going when you stepped down on to the step?    A. No, you could hardly see it moving.

" Q. I asked you how fast it was going?    A. It was moving—I don't know.

" Q. How do you know that ?    A. I can tell—the motion of the car, whether slow or fast.

" Q. Isn't it a fact that those cars run smoothly, and after

dark—unless you can see passing objects—you can't tell how fast the car is going; isn't that a fact? A. I don't know, I didn't pay much attention.

"Q. Isn't it a fact? A. I don't know; you can tell when they are moving at night.

"Q. You can tell by the rattling of the coupling? A. Yes.

"Q. But how fast they are moving you can't tell, unless you can see moving objects, can you? A. No.

"Q. You don't know, then, how fast this car was going when you stepped down on the step to get out? A. It wasn't moving hardly at all.

"Q. Except by the motion of the car, the rattle of the machinery, there wasn't anything to indicate whether they were going fast or slow? A. No.

"Q. Could you see passing objects around to tell whether it was going or not? A. No, I was looking at the step.

"Q. You hadn't yet reached the far side of the street, in the direction you were going, when you stepped off? A. Just about it.

"Q. I understood you to state you were only a portion of the way across the street intersection when you stepped off? A. No.

"Q. That is not correct? A. It was just about crossing the crossing.

"Q. The first crossing? A. The second crossing.

"Q. In the direction in which the car was going? A. Yes.

"Q. When you say the car was nearly across, do you mean the motor car was nearly across when you stepped off? A. Yes; the front car.

"Q. The front car was just approaching? A. The front car was across, I think.

"Q. Did you notice to see? A. The lamp post was nearly opposite me.

"Q. You noticed that? A. Yes.

"Q. You were particular to observe that? A. Yes.

"Q. And you noticed the lamp post was opposite? A. Yes.

"Q. You are quite positive of that? A. Very positive.

"Q. What makes you remember it? What made you look for the lamp post? A. I was just going to step off, and I looked up and seen the light."

Among the witnesses introduced by the defendant were a number of its employés, but, in addition to these, one J. P. Walker, who had never been connected with the company in any way, gave important testimony. In rebuttal, plaintiff, to weaken the force of this evidence, was allowed to introduce the evidence of one W. T. Ustick, tending to connect the witness Walker with a certain burglary, and for the purpose of showing that the witness had been arrested for the crime, although never convicted thereof or judicially charged therewith. The materiality of Walker's evidence and its importance will appear from the following transcript: J. P. Walker, being duly sworn, testified:

"Q. You were residing in the city of Denver, county of Arapahoe, and state of Colorado, in the month of September, 1890? A. Yes, sir.

"Q. Were you a passenger upon one of the Lawrence street cars of the defendant, the Tramway Company, on the evening of the 8th or 9th of September, the 9th, the car going south? A. Yes, sir.

"Q. Did you see the accident which occurred to the plaintiff in this case? A. Yes, sir.

"Q. State to the jury all you know about that matter. A. I was standing on the rear end of the front car going out Ninth street—

"Q. The rear platform? A. The rear platform of the front car.

"Q. The motor car? A. The front car—I don't know what you call it—with my back to the trailer, the car behind me, standing with my back towards the front car, my face towards the trailer, and this gentleman was sitting on the third seat from the front of the trailer, and just before the car stopped he got up and stepped down on the running board and stepped off and left the car when the car was in motion, and fell. As soon as I saw him fall, I put my foot

on the little rail that is there and got off, and I guess I was the first man that was to him. When he fell he was dragged a little with the car, and his foot was caught in the guard that guards the wheels, and there was two or three others got hold of him and took him to the sidewalk on Tenth avenue, and he laid there a little while, and finally we stood him up on his feet. He kind of weakened at first, but afterwards he stood up all right, and I made the remark that he wasn't hurt—that he was full, and that is about all there was to it.

"Q. You stated that the plaintiff was sitting on the third seat from the front end of the trail car? A. Yes, sir.

"Q. You are positive of that? A. I am certain of that, because I was facing him the same as I am facing that spittoon there.

"Q. How far was the car from the far crossing—the crossing where the cars usually stop—when the plaintiff arose to step off? A. Well, he stepped just as they entered Tenth avenue, but he went to get off about middle way of the street—middle way of Tenth avenue—before the car got to the stopping-place.

"Q. Was the car in motion at the time when he undertook to get off? A. Yes, sir, it was slowing up for a stop there.

"Q. Could you say about how fast it was going at that time? A. It was not running at full speed—it was slowing up—not very fast. It was within about ten feet when he fell to the time it stopped.

"Q. Did you notice the condition or appearance of the plaintiff on that evening with respect to sobriety? A. I don't know as I noticed. I took hold of his shoulders and helped to get him on his feet.

"Q. Did you notice any smell of liquor on his breath? A. I thought he was drunk.

"Mr. Carr—That is not an answer to the question.

"The witness—I did.

"Q. Was it a small or strong smell? A. It was a whisky smell.

"Q. Did you notice his actions in getting off the car? A. I was looking right at him.

"Q. Was there anything to indicate that he was not sober, in possession or control of himself? A. I don't know that I noticed anything like that when he was getting off until he fell.

"Q. Did you see the conductor of the train? A. Before the car stopped?

"Q. Yes, sir. A. He collected my fare. I think he was standing on the front end of the trailer at the time. ·

"Q. Whereabouts did the train—the car—commence to slow down—how many feet before you reached the accident? A. Just as it approached Tenth avenue it began to slow up. There was a ring made for the car to stop there—I think there was some ladies got off.

"Q. Did you notice what the plaintiff took hold of when he went to alight from the car? A. No; I could not say.

"Q. Did he take hold of the wooden upright at the side of the car? A. I didn't notice that.

"Q. Was this trail-car an open or closed car. A. An open car.

"Q. The one the plaintiff was sitting in? A. Open car.

"Q. Do you know whether or not the side of the trail-car projects over the edge of the track—over the rail—over the track rail? A. It projects over—yes.

"Q. About how much? A. Well, I don't know. I never took any notice, particularly, of it. I know it projects over, because his foot was in the guard.

"Q. Describe this guard to the jury. A. It is a kind of network made of iron, and it is in two pieces, I think.

"Q. It is the regular life guard that is on cars to keep objects out from under the wheels? A. Yes. His foot was in there and I pulled it out. I thought his leg was off, until I pulled it out. I was the first man to him.

"Q. How did he fall? A. Sidewise.

"Q. Away from the car? A. He fell away and rolled back—kind of back—and rolled and catched hold of the

guard with his hands. It dragged him quite a little piece.

" Q. Did you notice whether or not the train or car, in crossing to the place where it finally stopped, slowed up and then started again, or did it gradually slow down until stopped?    A. It gradually slowed down until it stopped.

" Q. There was no starting and stopping or jolting of the train?    A. No, sir."

The testimony of this witness was in no way weakened or changed by the cross-examination, but in rebuttal the evidence of the witness W. T. Ustick was introduced to discredit Walker's testimony, as more fully appears from the opinion of the court.    That portion of the first instruction, necessary to a full understanding of the opinion of the court, is as follows:

" * * * The court instructs the jury that the defendant company is a carrier of passengers, operating its cars by means of electricity, and is bound to use extraordinary care, and is liable for slight negligence.    And, on the other hand, the plaintiff, as a passenger on such car of the defendant, was bound to use ordinary care to guard against accident or injury.    And by such ordinary care is meant that care which a person of common prudence takes of his own concern, or that degree of care which men of common prudence exercise about their own matters and their own personal safety.    And in determining what would be ordinary care in a particular case, reference must be had to all the circumstances and surroundings of that case.    And if, all the circumstances and surroundings considered, the plaintiff in this case used such ordinary care in preparing to get off of the defendant's car, and in alighting therefrom, then he is not guilty of contributory negligence in producing the injury complained of and for which this suit is brought.    And getting up from his seat and preparing to get off of the car before the car had fully come to a standstill, but was very slightly moving, was not contributory negligence on the part of the plaintiff, unless such getting up from his seat and otherwise preparing to get off the car and alighting therefrom was done in a careless

or negligent manner, all the circumstances and surroundings considered. For, if such negligence—if there was any—on the part of the plaintiff was slight or the remote cause of the injury, he may recover, notwithstanding such slight negligence or remote cause. And, although the plaintiff may have been guilty of misconduct or failure to exercise ordinary care and prudence which may have contributed remotely to his injury, yet, if the agents of the defendant company were guilty of mismanagement or negligence in the management of said car, which was the immediate cause of the injury to the plaintiff, and, with the exercise of extraordinary care by such agents, said injury might have been prevented, the defendant is liable in this suit.

"And the jury are further instructed that, in arriving at a conclusion as to whether the plaintiff was guilty of contributory negligence at the time of the happening of the accident, they may take into consideration the natural instinct of self-preservation that any person under ordinary conditions will take care of himself from regard for his own life."

The remaining facts sufficiently appear in the opinion of the court.

Mr. JAMES H. BROWN and Mr. A. M. STEVENSON, for appellant.

Mr. V. D. MARKHAM, for appellee.

CHIEF JUSTICE HAYT delivered the opinion of the court.

The plaintiff, William Reid, at the time of the accident, was a passenger on one of the street cars of The Denver Tramway Company. The train in which the plaintiff was riding consisted of two cars, both used for the carriage of passengers, the first car being what is known as a "motor car," and the second a "trailer." These cars were being propelled by electricity communicated by means of a trolley and wires overhead. The accident occurred between eight

and nine o'clock in the evening, there being at the time a large number of passengers upon the two cars.

The only evidence for the plaintiff as to the accident was given by himself. His testimony in reference thereto is contradicted by several witnesses introduced on behalf of the company. Reid testifies that at the time of the accident he was upwards of sixty years of age, a blacksmith by trade; that he had taken passage upon one of the defendant's trains and paid five cents, the usual fare therefor; that he desired to get off at Tenth street; that when he was some distance away he signaled the conductor to stop at the next street, this being Tenth street; that he was at the time sitting on the front seat of the rear car; that as the car approached Tenth street he was preparing to alight; that he arose in his seat and stepped down on the side step, the car at the time moving slowly; that as he was stepping down he was thrown between the cars by a sudden stop of the cars; that by the fall he was rendered unconscious, or at least at the time of the trial had no recollection of what occurred immediately after he fell.

From other witnesses it was shown that the car was stopped within a few feet of the point where the accident occurred; that Reid was found lying in the street with his foot in the life guard in front of the wheels of the trailer; that when he was extricated he seemed to be in a dazed condition, which some of the witnesses attributed to inebriety. Dr. Hart, his physician, who was summoned soon after the accident, testifies that he found him suffering from severe bruises and burns; that both hands and both ankles were burned somewhat, his left hand and left ankle severely; that the left ankle was burned to the bone, and the bone covering torn to a considerable extent, and that he was bruised upon the back and elsewhere about the body.

The theory of the plaintiff being that these burns were caused in some way by escaping electricity, that plaintiff's body had come in contact with some part of the car that was charged with electricity, and that when his ankle struck the

ground the circuit was completed, experts were examined, whose evidence tends to show that the burns might have been caused in this way, although expert electricians were introduced by the defendant who testified that the burns could not have been caused in the manner claimed by plaintiff, or by electricity from the car in any way.

Some half dozen witnesses were introduced on behalf of defendant, who contradicted his statements as to the manner in which the accident occurred. These witnesses testified that the plaintiff, not waiting for the car to stop, got up and stepped off in the middle of the street, the cars being required to stop only at the far side of intervening streets. The conductor testified that he was engaged in collecting fares at the time and saw no signal from Reid to stop, but that the car was being stopped for other passengers to alight.

Among these witnesses was one J. P. Walker, who, at the time of the accident, was standing on the rear platform of the motor car facing the trail car, upon which plaintiff was riding. To overthrow the evidence of this witness, the plaintiff, in rebuttal, introduced one W. T. Ustick, who testified as follows:

" Q. Where do you reside?   A. 710 South Twelfth street.

" Q. What is your occupation at present?   A. City detective.

" Q. What was your occupation about the 20th of July, 1890 ?   A. City detective.

" Q. Has that been your business all the time from that time until the present?   A. Yes, sir.

" Q. I will ask you if you know one Joseph P. Walker, who formerly kept a saloon at 1242 Larimer street ?   A. Yes, sir.

" Q. How long have you known him?   A. Four years, or such a matter.

" Q. You knew him at that particular date which I have given you?   A. Yes, sir.

" Q. I will ask you if, on that date—on or about that date —did you know of any burglary having been committed in

the immediate neighborhood of Mr. Walker's saloon? A. Yes, sir.

" Q. Did you have anything to do with the investigation of that case. A. I did.

" Q. Now, I will ask you to state whether he was arrested. (Objected to).

" Counsel for plaintiff—All of these things may be proven to go to the credibility of the witness. (Objection overruled. Exception.)

" Q. State whether he was arrested for the offense. (Objected to as not the best evidence, and also because it is not competent, and is irrelevant. Objection overruled, to which ruling of the court the defendant, by its counsel, then and there duly excepted.) A. Mr. Walker was taken into custody at that time and taken to the City Hall, and was released there at the City Hall.

" Q. Will you state if you know whether any goods were taken from the house at the time it was burglarized, and if so, where these goods were found?

" Counsel for defendant—If they are going to try Mr. Walker for the offense of burglary, I think he should be present. I don't see the necessity of taking the time of the court with these collateral matters, and we object to it.

" Counsel for plaintiff—The object of this question is to prove that the goods burglarized were found on the premises of this man Walker.

" The court—I think the witness ought to be here for the purpose of defending himself."

The evidence of this witness is so far outside of the limits of legitimate testimony as to remove all question of its admissibility beyond the realm of controversy.

The witness Walker was afterwards recalled for cross-examination, and while upon the witness stand denied all connection with the burglary, and it is urged that this is an antidote to the poison of the testimony of the witness Ustick. It may well be doubted, however, if the antidote was sufficient to counteract the virus. The introduction of the wit-

ness Ustick for the purpose of testifying in reference to the alleged burglary and connecting the witness Walker therewith was a flagrant violation, not only of the rights of the defendant company, but of the privilege of the witness Walker as well. The obvious and only purpose of the evidence was to impeach the testimony of the previous witness. In view of the fact that the witness was interrogated solely in reference to this burglary, his introduction must be considered as a deliberate attempt to prejudice the jury against the defendant's witness by a method condemned by the law. There could have been no other reason for this evidence, and, having introduced him for such purpose, counsel are not in a position to gravely urge at this time that the evidence of Ustick did not have the effect intended, and which it was well calculated to have. The verdict is against the weight of evidence, and it is probable that the result was influenced by this improper testimony and the remarks of plaintiff's counsel, and therefore the judgment must be reversed.

We are also of opinion that the first instruction is erroneous. By it the jury are told, *inter alia*, that, " The plaintiff getting up from his seat and preparing to get off of the car before the car had fully come to a standstill, but was very slightly moving, was not contributory negligence on the part of the plaintiff, unless such getting up from his seat and otherwise preparing to get off the car and alighting therefrom was done in a careless or negligent manner, were the circumstances and surroundings considered. For, if such negligence —if there was any—on the part of the plaintiff was slight or the remote cause of the injury, he may recover, notwithstanding such slight negligence or remote cause."

In the last few years horses have been almost entirely displaced as a motive power on street car lines in cities by cables and electricity, and the operation of cars and trains correspondingly accelerated. As transit becomes more rapid, the dangers incident to street railway travel are correspondingly augmented, and as the danger is increased the law exacts greater care on the part of both the passenger and the carrier.

For this reason many of the decisions applicable to passengers on horse cars are inapplicable to the newer methods of transportation. The cable and electric service of to-day more nearly resembles the ordinary railway train, and the case law which has grown up with reference to the latter is more in point. It has been held in a number of cases that a passenger upon a railway "has no right to attempt to alight from a train of cars when in motion, and if he undertakes to do so without the knowledge or direction of any employé of the company, it is at his peril." *Secor et al. v. T. P. & W. Ry. Co.*, 10 Fed. Rep. 15, and cases cited; 2 Wood's Railway Law, secs. 305, 1126; Hutchinson on Carriers, sec. 643; *Solomon v. The Manhattan Ry. Co.*, 103 N. Y. 438.

In other jurisdictions it has been held that in case of injuries received by a passenger in alighting from a slowly moving train the question of plaintiff's negligence is a question of fact for the jury to determine. And this seems to be the trend of recent authority, although this rule is subject to some exceptions. Beach on Contributory Negligence, sec. 147; *Leslie v. The Wabash, etc., Ry. Co.*, 88 Mo. 50; *Taylor v. The Missouri Pacific Ry. Co.*, 26 Mo. App. 336; *Penn. R. Co. v. Lyons*, 129 Pa. St. 113; *Covington v. The Western, etc., R. R. Co.*, 81 Ga. 273.

The latter view we think the better one as applied to passengers upon electric cars. In this case the plaintiff says that he was preparing to leave the train, by stepping down on the side step, when he was violently thrown to the ground. This being the preparation stated by the plaintiff, the jury must have believed from the instruction that they were not at liberty to hold him guilty of contributory negligence by reason of this act, unless performed in a careless or negligent manner. The accident occurred between eight and nine o'clock at night. The plaintiff was at the time upwards of sixty years of age, and whether, in these circumstances, it was negligence on his part to thus step down on the moving car, was not a question of law for the court, but a question of fact for the jury.

Then, again, this instruction seems to recognize compara-
tive degrees of negligence.   It is misleading in this respect,
if not positively erroneous.   Outside of the states of Illinois,
Georgia and Tennessee, and perhaps a few others, such com-
parison is not permitted; the test elsewhere being the plain-
tiff's contributive negligence.   And it may now be considered
as well established, outside of the above jurisdictions, that in
cases of this character the plaintiff cannot prevail if his own
negligence contributed to the injury, and without which it
would not have happened.   *Lord v. Pueblo Smelting & Refin-
ing Co.*, 12 Colo. 390; Beach on Contributory Negligence,
sec. 34; *O'Keefe v. The Chicago, R. I. & Pac. R. R. Co.*, 32
La. 467; *Wells v. N. Y., etc., R. R. Co.*, 24 N. Y. 181; *Wilds
v. The Hudson, etc., R. R. Co.*, 24 N. Y. 430; *Louisville, etc.,
Ry. Co. v. Shanks*, 94 Ind. 598; *Starry v. The Dubuque &
S. W. R. Co.*, 51 Iowa, 419.

For the reasons given, the judgment of the court of ap-
peals will be reversed, with directions to reverse the judg-
ment of the trial court.

*Reversed.*