Woodruff, J.
Except upon one material question, viz., whether the bell,’ on the defendants’ locomotive, was rung, as required by statute, there is very little, if any, conflicting testimony in this ease.
On a stormy, blustering, snowing night, the plaintiff’s intestate, in a one horse sleigh (or cutter), was driving southwardly down North Second street, in the city of Troy, at the rate of “four or five miles an hour.” This is according to the testimony of the principal witness for the plaintiff: Another describes the rate as “faster than a person would ordinarily drive.” Another, “ They were going on a trot, an ordinary gait.” One of defendants’ witnesses says, “at a pretty rapid rate; that is, a good ordinary drive; a little faster, perhaps.” Another, “ They were driving on an ordinary trot.” .
At the same time, the defendants’ servants, engaged in depositing cars to be unloaded, and picking up empty freight cars, were moving a train of six cars about one hundred and sixty feet in length backwards, eastwardly along the railroad track, called the South branch, crossing North Second street at a rate “ not exceeding four miles an hour.” This is according to the testimony of the defendants’ principal witness. Another stated, “ The train was going about as fast as a man could walk.” Another, “ It was going about as fast as a man could walk.” One of the plaintiff’s witnesses says, “They were going like a fast walk; I could walk along with them.” Another, “I think the cars were going a little faster than a *36 man could walk,” and mother, “I think the cars were going faster than a man would naturally walk.”
Very shortly before the cutter crossed this south branch railroad track, and while a few feet north of it, the horse “shied” to the east, sprung forward across the track, and the intestate and his brother were thrown out; the intestate falling about forty-six feet south of the track, fatally injured; and the horse and cutter continued down the street. The cars crossed the street at the same, or very nearly the same moment; and the testimony of the brother, and some other witnesses, tended to show that the foremost, of the cars hit the hind end of the cutter as it passed, and so caused the accident and injury to the intestate: For this injury, the present action is brought.
The principal questions relate to the duty of the defendants to give warning of the approach of trains; whether it is then duty to keep a watchman or flagman at crossings; and whether the plaintiff’s intestate was himself guilty of negligence, contributing to the collision, which caused his injury.
The statute requires (beside sign boards at crossings, &c., as.to which there is no question in this case,) that a bell shall be placed on each locomotme engine run on any railroad, and rung at the distance of at least eighty rods from the place where the railroad shall cross any traveled public road or street, on the same level with the railroad, and be kept ringing, until it shall have crossed such road or street; or a steam whistle may be attached to such engine, and be sounded, except in cities. Penalties are annexed to a neglect of this 'requirement; and the railroad corporation is declared liable for all damages, which shall be sustained by any person, “ by reason of such neglect.”
TJpon the question, whether, at the time the train in question approached and crossed North Second street, the bell upon the engine was rung, the evidence was such that, I think, it was not erroneous to submit the case to the jury; and if they found that the bell was not so rung, and that the injury to the intestate was sustained by reason of that neglect, *37 the plaintiffs were entitled to recover, subject, of course, to the power of the court below to grant a new trial, if the verdict was deemed against the weight of the evidence. It is • true, that three of the defendants’ servants—one standing on the ground, and two upon the train—swear positively that the bell was ringing; one of them, that he was himself ringing the bell; and another witness, who was on the east side of North Second street, a mere spectator, swears, with equal positiveness, that the bell was ringing. On the other hand, four witnesses, being within a few feet of the crossing, say that they did not hear the bell; and two of the defendants’ servants—one on the train, and one not far from the crossings—did not hear, or, at all events, did not notice the ringing of the bell.
However I may think, upon a perusal of the printed testimony, that the preponderance is in support of the defendants’ allegation, that the bell was rung, I cannot say that, if the case had gone to the jury under correct instructions, as to the law governing the subject, the judgment should be reversed for error in law, because the jury were permitted to pass upon that question.
The counsel for the appellant, on the argument, says that no serious question was made on the trial as to the fact, so positively sworn to, that the bell was rung; but that the actual contest there was, in regard to the effect of ringing the bell on the engine, when such engine was pushing six freight cars backwards over the crossing, and as to the duty of the defendants to give other warning of the approach of those cars.
This is not improbable. I have, nevertheless, referred to these proofs, for the purpose of showing the precise state of the case upon which the instruction, upon this point, was given to the jury, which is the subject of exception by the defendants. That instruction was: “ The object of ringing the bell is to have it heard. It is a signal of the approach of the cars at the crossings, and it should therefore be rung under circumstances likely to give notice to passers by, if it is to be of any use. The literal provision of the statute may *38 be, perhaps, satisfied by having it rung at its proper place on the car, and while crossing over any particular position. There may be circumstances which require that this particular signal, or some other signal calculated to give notice to passers by, whether on foot or with a vehicle, should be given at a crossing. You are to determine what signal would be sufficient, and whether such signal was in this case given; ” and when the especial attention of the court was called by the defendants to this language, it was further added: “ The object of the requirement of the ringing of the bell is to give notice to travelers, and perhaps others, of the approach of the-train. The bell should be rung under such circumstances, as that it may be heard and gime the requisite notice; otherwise the object of the requirement is not complied with.”
It is not very clear to my mind, what was intended by this instruction; and yet it is very clear that, according to mj views of the law on the subject, it was erroneous, and eminently adapted to mislead the jury. It tended, I think, to an entirely mistaken interpretation of the statute, declared a further peremptory duty of the defendants to give signals of the approach of their trains to a crossing, and, finally, in the broadest terms, left it to the jury to say, what signals would be sufficient to give notice to others, and whether such signal was in this case given.
It contains a doubt whether ringing the bell on the engine is a sufficient compliance with the statute, and declares that the bell should be rung under such circumstances, that it may be heard, and give the requisite notice; otherwise, the object of the requirement is not complied with. If this means anything less, in its connection with the present case, than that the bell should be rung at some other place, than on the engine, I am unable to understand it. And any construction of this language, which imports that ringing the bell on the engine, is not a full and complete compliance with the statute, is erroneous. The language of the statute is explicit: “ A bell shall be placed on each locomotime engine * * and rimg * * and be kept ringing,” &e.; and the requirement that *39 the bell shall be there, is just as absolute and unqualified, as the requirement that it shall be rung.
The instruction raises three questions:
First. Is our statute complied with by the ringing of the bell upon the locomotive engine ?
Second. Does any rule of law require the railroad company to ring a bell anywhere else, to give notice of the approach of a train ?
Third. Are railroad companies bound, besides and beyond complying with the requirements of the statute, to give such signals of the approach of their trains, as a jury may deem sufficient to give notice to passers at a crossing ?
The first question is answered, I think, already. The terms of the statute are explicit. It requires the bell to be upon the locomotive, and to be rung; and if it be rung, and in the place where the statute directs that it shall be placed, that is done, which the statute requires.
On this point, I do not, in this place, assume to say what the defendants should do, when running a train backwards; in which case, cars are moved toward the crossing, which are nearer thereto, and quite distant from the bell. Here I speak of the construction and legal effect of the statute. If a train moving backwards is within the statute, then ringing the bell upon the engine is compliance with the statute, which in no wise provides for ringing a bell anywhere else.
If a train moving backwards is not within the statute, then whether any and what signals of its approach must be given, will depend upon other considerations than the requirement of the statute; and so, also, if being within the statute requirement, whether the circumstance that it is moving backwards creates a duty to give other signals, not mentioned in the statute, will depend upon the answers' to be given to the other questions above stated.
In either case, all that the statute requires is, that the bell upon the engine be rung, and be kept ringing.
The second question above stated hardly deserved a separate consideration. Deserving, for the moment, .the third *40 question, viz.: "Whether railroad companies are bound to give signals, which the jury deem sufficient notice of the approach of their trains, it cannot ¡be stated, as matter of law, that they are bound to ring a bell on any part of the train, except where the statute has required it to be placed and rung.
1. It has been made the subject of distinct statute regulation ; and the statute has declared when and where it shall be rung; and to say that, as matter of law, the company shall also ring a bell somewhere else, is legislation. It is to add a requirement relating to the same identical subject, which the legislature did not deem necessary. When this precise topic was before the mind of the legislature, and they acted, it is to be presumed that all the bell ringing which, as a legal duty, was to rest upon railroad companies, was then prescribed.
2. Various means may be suggested, which would tend to give notice of the approach of a train; some more and some less convenient; some more and some less effectual. A bell may be placed and rung upon some other part of the train than the engine, or at some point not far distant from the crossing, at the side of the track. The train may come to a stop, and send forward a messenger to the crossing. In case of ordinary trains, a telegraph dispatch may be sent from the nearest station left by the train, to a station at the crossing arranged for its reception. Other means of giving notice might be proposed. But out of these the court cannot select one and say that, by law, the company are bound to use it. Requirements of this nature are the proper subject of legislative regulation. They are, to some extent, regulated by statute, both in England and in this country; and to legislation they properly belong.
These observations leave the third of the before stated questions open to examination, viz.:
Are railroad companies bound, as matter of law, besides or beyond complying with requirements of the statute, to give such signals of the approach of their trains as a jury may deem sufficient to give notice to passers at a crossing?'
This inquiry does not pertain solely to the subject of ring *41 ing a bell, or giving other particular notice. It equally embraces another portion of the instructions given to the jury in this case. The defendants had no flagman at the crossing in question, and the plaintiffs claim that this was negligence in the defendants. While on the other hand, the defendants requested the court to charge, that the defendants were under no legal obligation to station a flagman or signalman at the crossing in question. This was refused; and to the refusal, and to various parts of the charge, on this subject, the defendants excepted. Thus, the judge charged: “ There is no statute law, making it imperative upon the defendants to maintain a flagman at this station; but this does not absolutely determine whether or not it was not incumbent upon them to do so. They are held to the use of proper care; and it is for the jury to say whether this, under the circumstances, did or did not require of the defendants to maintain a man at this crossing.”
And again: “ I leave it for you to say, under all the circumstances, whether a flagman at this station, as a measure of proper caution, was or was not required of the defendants.”
These instructions are in harmony with the previous direction given to the jury, in regard to signals generally, already above quoted: “You are to determine what signal would be sufficient,” &e. These instructions are, therefore, conveniently examined under the above third question, and are fairly embraced within it; for if railroad companies are bound by law to give such signals of the approach of their trains, as a jury may deem sufficient to give notice to passers at a crossing, then, as was instructed here, the jury may include flagmen, and any other means of notification they deem sufficient, and hold the omission negligence.
I apprehend that railroad companies do not run their trains under the pressure of any such rule of law; and that the means, which it is their legal duty to employ to prevent third persons from sustaining injury, are not dependent upon any such broad discretion, legally intrusted to a jury.
*42 In my judgment, the legal duty, which (irrespective of any statute) rests upon a railroad company, is to run then- engines and ears carefully, prudently, with a caution proportioned to their prodigious power to injure, and governed hy a regard for the time, and place, and all other circumstances affecting the liability of third parties to receive injury, while in the exercise of reasonable care and prudence on their part. ¡Neglect of this subjects them to a just responsibility for the consequences to such persons injured thereby.
And on the other hand, the reasonable care and prudence, required of third parties, is in like manner governed by time, place, and circumstances of danger, which, it becomes them to hold in view, when exercising their unquestionable right to cross the railroad track.
This high measure of duty on the part of the railroad company, the statute, prescribing notices by signboards at road or street crossings, the ringing of the bell, or the blowing of the whistle, has not relaxed in any degree. As a rule of duty, it stands as stringent and inflexible, founded in common law and the plainest right, as if there were no such statute. Compliance with the statute is, of course, one of the circumstances, under which they run then* trains; and, incidentally, such compliance may make it consistent with due care and caution, to do what, without using such signals, would (even if there were no such statutes,) be negligence. But the rule stands, and the statute stands with it; both must be satisfied. And hence, it is properly said, the statute does not constitute the sole rule of duty. The. common law still requires the exercise of care and prudence in the running of their ponderous engines and heavy trains "through an inhabited country; and that care and prudence increases in degree, as they enter towns, villages and cities, and cross their thoroughfares.
From this duty, there should be no abatement. ¡Nor, on the other hand, should the obligation of third persons to be prudent and careful be, in any degree, relaxed. As has been well suggested, in relation to this subject, when the question *43 becomes, as in ordinary cases it is, one of life and limb, not only to the unfortunate third party who encounters a collision, but to the hundreds of passengers in a train, the duty of third persons to the company, and to them, to be diligent in the use of precautions is hardly less than that of the company to him. He who negligently, as well as one who wilfully, casts an obstruction upon the track, is rightfully subject to severe condemnation and punishment. And one who, through any want of reasonable prudence, thrusts his vehicle before an approaching train is not much less reprehensible.
The point of departure from the doctrine of the court below is precisely this: If the company have satisfied the rule of duty above stated, i. e., in view of all the circumstances under which they are acting—the time (whether by night or by day), the place (whether in the open country or in a town, village or city), the liability of third persons to receive injury (whether at a crossing of a country road or of a street in a populous town or city), the character of the avenues of approach on either part (whether there be sharp curves or corners, or there be buildings or other obstructions hiding the train from view till at a moment before crossing), the head light or other signals they deem it expedient or do, in obedience to the statute, in fact, bear with them, and any other circumstances (darkness or light, storm of snow or wind), which, in the particular case under examination, are relevant to the subject—have acted with careful prudence, they are not to be held responsible for an accident, because they did not go further and give notice that they were doing so.
It is not, when they have done this, to be left broadly to a jury to say whether, if they had placed a man or men along side the track, or at crossings, to compel or to notify third parties to be also careful, it would not be a sufficient notice, and one which they were bound to give.
For be it observed, the rule which I have endeavored to state, is not satisfied, unless such running of their trains be in fact safe to those who are in the exercise of their proper pru *44 denee and care. "Unavoidable accidents may occur; "but the guide of duty on either hand assumes that, if each party is duly careful, neither will be injured.
So much has been said in discussions of this nature, that I deshe to be clearly understood. I am not propounding any lax rule. I am not, I think, stating any new rule. The rule which I state, is, I think, in precise conformity to all sound principles governing the conduct of human affairs, in which each party is bound to have just respect to the rights and duties of others, and in which each has a right, in governing his own conduct, to assume that all others will perform their duties also, and act accordingly, unless and until he sees, or, ■ by the exercise of ordinary care, might see, that it is dangerous to do so. But it will not permit a party, in reliance on such an assumption, to neglect his own means of self-preservation on the plea that he assumed that other parties would be duly careful, and for that reason, subject himself to injury, which by due care he might, nevertheless, have avoided. The right to assume that others will perform their duty, to be duly careful, does not warrant him in omitting due pre cautions. On the contrary, such an omission makes the negli gence of both concur in producing the result.
For illustration of this subject, and especially with reference to an alleged duty to keep a flagman at a crossing, a case may be stated, in which the street crossed by the railroad track is built up with dwellings, or other obstructions exist, which render it impossible for persons passing along the street to see a train of cars until it enters, or is about to enter upon the crossing. Such examples are not few. . The case now under consideration is in a degree of that character. Several recent cases, considered and decided in England, have presented that feature, or circumstances closely analogous.
In such cases, the duty of the railroad company to station a flagman on the spot, to give notice to passers of the approach of trains, is urged with great force. “Shall the railroad company be permitted to suddenly, and without other warning than the statute prescribes, thrust their trains upon the *45 unwary person, crushing him to instant and inevitable death ? ” This is a serious and urgent question.
It is so serious that it may, perhaps, be deemed a proper subject of further legislative provision, as it has been in some cases in England, by authorizing and requiring the erection of gates, to be closed at about the time of the arrival of trains. It may not be best for the public good to leave the companies to act, even under the rule of duty which I have stated, upon their responsibility for its violation. And such legislation would have this great advantage to railroad companies, as well as individuals. It would furnish a precise rule of conduct to be observed, and give the particular precautions to be used, and would not leave it to a broad discretion of a jury to say what further acts of the company should be required.
But in the absence of other legislation than we have, may the companies, if they give the statute warning, under all circumstances of disadvantage to passers by, run them down, if, through failure to hear the warning or see the train, they attempt to pass ?
By no means. The rule I have stated involves no such result. The greater the circumstances of difficulty in avoiding the train, in hearing its signals, in seeing its approach (howsoever they arise), the greater caution is devolved upon the railroad company in making that approach; and the like greater caution is devolved upon persons passing to be vigilant and careful, to use all the means at their command, before attempting to cross. And this answers the question.
The circumstances under which a train is about to approach a particular crossing, may be such, that it would be plainly imprudent, clearly negligent of what is due to the safety of others, to advance at any considerable speed. If so, the rule stated requires, that the movement of the train shall be adapted to these circumstances. If it be said, that this would be onerous to the company, and greatly retard the dispatch of their business, the answer is, you have no right to transact your business or promote its dispatch, without due regard to *46 the rights and safety of others. And this brings into view what I have on another occasion mentioned.
Bailroad companies may, if they desire to conduct their business with greater facility or dispatch, adopt precautions, which make it practicable and consistent with due caution, care and prudence.
For example, if. they desire .to pass along the street of a city, they may place a mounted horseman in advance of their train (as has been done on one or more roads), to give warning. If they do this, it may be quite consistent with due care to move their train with moderate rapidity; while if they do not, they will be bound to move very slowly, and with much greater circumspection.
So, under most circumstances at a street crossing, and especially where buildings or other obstructions hide the approaching train from view, or obstruct the hearing of the statute signals, they may expedite their business by placing men at the crossings, to see to it that no one exposes himself to danger; while, if they adopt no such expedient, they must .move at such a rate only, as is entirely consistent with due care and prudent regard to the safety of others who are liable to be injured, notwithstanding they are themselves duly careful.
The question to be submitted to the jury is not therefore, whether, in their judgment, due cate required the railroad company to keep a flagman at the station to give warning; not, whether that was a suitable mode of giving notice of the approach of a train; not, “ what signal would be sufficient ” to give such notice. But the question is, whether, under the actual circumstances of the case, the company exercised reasonable care and prudence in what they did, and whether its neglect caused the injury complained of.
If it was in the night season, and dark and stormy, that is to be considered; not because it is negligence to run a train of cars in a dark and stormy night, but because that may properly affect the manner of running.
If the track made a sudden curve, or was hidden by build *47 ings on the street, or other obstructions coming near to the track, that is to be considered; not because it is negligence to run a train of cars around a sharp curve, or on a track approaching the crossing thus partially concealed from view, but because that may properly affect the manner of running.
If there be no one at the crossing to warn third persons of the approach of a train, or if there be men at the crossings, and horsemen riding in advance in the city street, that may also be considered; not because it is negligence not to station such men at the crossings, or send a mounted messenger in advance, but because that also may properly affect the conduct of the train and manner of running.
So, also, if the servants of the company are moving a train backwards (as in the ease now before the court), so that the statute signals, if given, were at a considerable distance from the car which was nearest the crossing, that is to be considered ; not because the company may not so lawfully move a train, but because that may properly and materially affect its management and motion; and especially so, if it be dark or stormy.
In short, under all the circumstances, in which the company or its servants were acting, were they guilty of negligence in the conduct and running of the train, which caused the injury to the complaining party, and did no negligence of his contribute to the result? Some facts are so obviously conclusive of negligence, that they may be so stated as matter of law. Some things are so plainly dictated by ordinary prudence, that their omission may be declared by law to be negligence.
And, on the other hand, some acts are so clearly free from imputation of that sort, that it would be the duty of the court, as matter of law, to hold that they constituted no proof of negligence.
While, when the facts are themselves in dispute, or upon the proofs, their wisdom or efficiency is doubtful, the jury must decide whether negligence was proved.
On the one hand, it would be a bold claim, where a rail *48 road train approached a crossing in clear daylight, at a rate no faster than a man could walk (giving the statute signals), which should insist that there was any ground whatever for imputing negligence; and on the other hand, if a train, at the rate of forty miles an hour, emerged from behind buildings, or other obstructions hiding it from view, suddenly upon the street crossing in a populous city, there would be a little hesitation in pronouncing it negligence, although the statute signals were given.
These same considerations, applicable to the conduct of the railroad company or 'its agents, are alike applicable to the conduct of persons, who are liable to be injured. All the circumstances, which render it more than usually difficult for them to see or avoid a train, are so many reasons why they should be more vigilant and cautious on their paid, and instead of forming an excuse for omitting to use greater caution, impose it upon them with greater strictness.
The recent English cases are, I think, not only consistent with the view which I have expressed, but in confirmation of it.
Thus, in Bilbee v. The London, Brighton and S. C. Railway Company (18 C. B., N. S., 584.) The plaintiff was knocked down and injured at a crossing, where there was a foot way with swing gates. It was urged that the statutes cited, which required the erection of gates at crossings, and the employment of proper persons to open and shut them, applied to the foot way in question. This was, on the other hand, denied. The court, at the trial, refused to hold that there was any obligation to have a person in charge of the gates, at a crossing for foot passengers, and left it to the jury to say, whether the company had been guilty of negligence. After verdict for the plaintiff, the court in bar refused a new trial. The observations of the judges are in conformity with the general idea, that all the circumstances are to he considered in determining the question of negligence. Stapley et al., executors, v. The sarnie company (Law Rep., 1 Exeh., 21); Shilton v. London and Worthwest Railway Company (Law *49 Rep., 2 Com. Pleas, 631); Jones v. Great Western Railway Company (id. 634, note); are in harmony with this view. In Stubley v. The London and Northwestern Railway Company (Law Rep., 1 Exch., 13), the plaintiff’s intestate was killed at the crossing of a foot path. At the trial before Blackburn, J., at the Assizes, the jury were instructed, for the purposes of the day, to assume, that the law cast on the defendants the duty of taking all reasonable precautions to protect passengers, including the keeping of a watchman, to warn them of the approach of a train, if that is, under the circumstances, reasonable ; but the judge reserved leave to enter a nonsuit. On rule to show cause why a nonsuit should not be entered, on the ground, that it was error to state to the jury, that the company was bound to provide other protection than was already provided, it was strenuously argued, that they were bound to have a watchman at the crossing. The rule for a nonsuit was made absolute. The company were not deemed in any fault, while the plaintiff’s intestate was held to have suffered by her own negligence. Baron Bramwell observes: “ The argument would show, that, on every road, every canal, every railway in the kingdom, means must be taken to warn people against the consequences of their own folly. * * I look upon all those rules, regulations and provisions, which are made to take care of people, when they should take care of themselves, as positively mischievous.” In adverting to some observations of the judges in the case of JBiTbee, first above referred to, the court deem those which seemed to intimate a duty to keep a watchman, under special circumstances, to be applicable only to the particular circumstances, and to be no precedent. And in the case of Shilton, also above cited, Bo vile, O. J., in reference-to circumstances, in which the line of road is such, that it is-difficult to see the approaching train, says: “If the crossing-was rendered dangerous by obstructions to the view,, it- only made it more i/nev/mbent upon the plavnbiff to take corre.” The last two cases tend rather to the conclusion that the. plaintiff *50 here should have been nonsuited, than that he had ground tc complain of the defendants.
If it be assumed, that the defendants were in fact ringing their bell, as required by statute, I find it impossible, in this case, to impute to them negligence, in moving their train no faster than a man could walk towards and over the crossing. That a man stood on the nearest car, with a light, is not contradicted. That the cars could be seen for more than sixty feet, is shown, not merely as opinion, but they were so seen. Two young women—one called by the plaintiff, and one by the defendant—-saw them at a greater distance than sixty feet. Most of those, who saw the accident, were, some at more, and some at nearly that distance. This does not show that the deceased saw the cars; but it does show, that neither darkness nor storm rendered it impracticable. The deceased was not a stranger. He had been conductor over the very road in question, and was familiar with the place; and he took no precaution, not even to retard his speed, until the horse, more provident than himself, took the alarm. If, under such circumstances, the jury had found that the deceased, engaged, according to the testimony, in conversation with his brother, drove heedlessly into danger, it could not be said, that the evidence did not support the finding. It appeared that one of the persons on the sidewalk caHed out to warn him, but failed, apparently, to attract his notice. The opinion of the court in Stubley v. London and Northwestern Railway Company (Law Rep., 1 Exch., 13), where a nonsuit was ordered, and where the plaintiff took no precaution, and a like warning was unheard, bears with great force on the present case. The considerations suggested go far to support the defendants’ .claim, that the plaintiff was palpably and grossly negligent. 'The night, the storm, the buildings on either side, were so •many circumstances admonishing him to more than usual .caution; and yet appear to have failed to induce even a .moderation of his speed.
On the question of the plaintiff’s contributing negligence, J amTribf ableffoTiscover any reason for a refusal tockarge, as *51 requested bv the defendautsLpmpnseUfbafr-td-i-o-pl-am-t-iff-p.oidd not recover, unless the death of their intestate was solely caugedrfryThe wrongful act^neglect,, -or- default-of-the-defeitd— ants, or tffeiFservants, &c. The court deemed it proper to change the term “ solely ” to “ essentially,” i. e., “ the death must be caused easeñSalfjFhy tbatmct^neglect or default, and not by any contributing neglect, on the part of the defendant.” This seems tó me to declare, that the neglect of the deceased maydravWBpñtri buted to the death; but if the essential cause was the act, default or neglect of the defendants, the plaintiff may recovSn—Tbfcns'ñdrthe rule. IfUotlFparties are negligent ; ifYfae~SggIigence of the plaintiff concurs with that of the defendant, both""" contributing to the result, neither court nor~jigy~5re~peimiftedUoYheasure tbe "degree ~of"contribution, or inquire-whether it was the negligence of the one or the other, which was tlie essential cause of ~death. There was nut, andYfxsliot claimed that there was, any negligence of any third person, having any connection with or bearing upon the question. The instruction has sole reference to the negligence-efdtoTwd^artieTrespectively.
The defendants’ request for the instruction, that, “ if the deceased could have seen the approaching train, by looking in the direction of it, before he reached the crossing, and in time to have avoided the collision, and omitted to do so, such omission was negligence,” should, I think, have been complied with. Unless it is true, that one, who has been conductor on a road, and is familiar,therewith, may drive over its crossing without looking to see, whether a train is near, and be held, nevertheless, to have used reasonable care and prudence to avoid accident, this request should have been granted. The cases I have above referred to, and numerous cases in this State, deny that one, consciously approaching a railroad track, may neglect so simple and so obvious a precaution.
And the instruction that, “ if the deceased, knowing the position of the railroad in question, and that trains were frequently run thereon, approached the crossing at such a rate *52 of speed, that he was unable to stop his horse before getting upon the track, and in consequence thereof, the collision occurred, the plaintiff cannot recover,” is in the precise words of an instruction, to which .defendants are declared by this court entitled, in Wilds v. Hudson River Railroad Company (24 N. Y., 430).
That case is instructive on many of the points, which are above considered, not only as reported above, but also when again before this court, when the opinion of the court was '.given by .the late Chief Judge Denio, from which the learned judge, before whom the present case was tried, dissented. In those two reports, the cases in this State are largely collected.
I think the judgment should be reversed, and a new trial ordered.